IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMIE ANDERSON,

                                                            OPINION and ORDER

                Plaintiff,

                                                             08-cv-234-bbc

     v.

COUNTY OF LA CROSSE,
Sheriff STEVE HELGESON,
Captain DORIS DAGGETT,
Jailer BILL OLSON, Sergeant LEE SCHMITZ,
Captain MICHAEL HORSTMAN,
Retired Sheriff MIKE WEISSENBERGER and
Jailers DOE, In their individual capacities,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Jamie Henderson was assaulted by another prisoner while both were incarcerated at the La Crosse County jail in May 2006. In this lawsuit brought under 42 U.S.C. § 1983, plaintiff contends that defendants should be held liable for failing to prevent the assault. The key piece of evidence on which plaintiff relies is a note that he wrote about the other prisoner five days before the assault occurred: "You need to check the cameras [be]cause the black retarded dude Koko hit Ron Ferri and Koko has started crap with me a

1

few times. He hits me and I won't let him get away with it."

In his response to defendants' motion for summary judgment, plaintiff acknowledges that only two of the defendants saw this note: Bill Olson and Lee Schmitz. Plaintiff concedes that the other defendants should be dismissed. With respect to Olson and Schmitz, I agree with defendants that neither the note nor anything else that defendants saw would allow a reasonable jury to find that plaintiff meets the standard for establishing liability under § 1983: that defendants were actually aware of a substantial risk that plaintiff would be seriously harmed. (Because defendants Olson and Schmitz are the only two defendants at issue, I will refer to them simply as "defendants" for the remainder of the opinion.) Plaintiff's note may have suggested that he was not getting along with the other prisoner or even that the two should keep their distance from each other, but it did not show that an assault was imminent. Accordingly, I will grant defendants' motion for summary judgment.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

In April 2006 plaintiff was incarcerated at the La Crosse County jail after he was arrested for "multiple counts" of battery and disorderly conduct. Plaintiff was placed in

2

maximum security because of the violent nature of his offense and because of behavioral problems he exhibited during previous incarcerations, including a fight with another prisoner in 2005. Plaintiff did not challenge his classification.

On May 4, 2006, Lencardo Thompson was arrested for battery and disorderly conduct. He was placed in maximum security, in the same cell block as plaintiff. Thompson and plaintiff did not know each other at the time of their incarceration at the jail. Plaintiff's initial perception of Thompson was that he was "real hyper," "start[ed] trouble with everybody" and "thought he was running the place." Once during a card game, Thompson began yelling at plaintiff, saying that "he would knock [plaintiff] out." Plaintiff walked away.

Plaintiff did not tell any of the jail staff about concerns he had about Thompson until May 18. On that day, Thompson punched another inmate, Ron Ferris. (When asked to describe the incident, plaintiff said that Thompson "[j]ust knocked [Ferris] down, red mark.") Later, plaintiff told defendant Bill Olson, a correctional officer, that he had a problem, but Olson told him to write it down on an Inmate General Request Form. Plaintiff wrote the following on a form: "You need to check the cameras [be]cause the black retarded dude Koko hit Ron Ferri and Koko has started crap with me a few times. He hits me and I won't let him get away with it." Plaintiff gave Olson the note, telling him, "You need to check the cameras."

3

When Olson read the note, he understood that "Koko" was a reference to Thompson. However, the only "Ron" that lived on plaintiff's cell block was Ron Pataska. (In their proposed findings of fact, the parties appear to agree that Thompson had hit "Ron Ferris," but also that Ferris was not housed in the same part of the jail as plaintiff and Thompson. Neither side explains this discrepancy.) In addition, Olson noted that plaintiff had not identified a particular time any incidents had occurred, no one else had complained about Thompson and plaintiff did not request to be moved. Nothing about plaintiff's history or demeanor suggested that he was a vulnerable prisoner.

Later in the day, Olson showed the note to defendant Lee Schmitz, a jail sergeant and Olson's supervisor. Schmitz said that correctional officers should observe plaintiff and Thompson, as well as Pataska, who Olson and Schmitz believed could have been the "Ron" plaintiff mentioned in his note. However, Schmitz said that they should not draw attention to any of the prisoners or give any indication that one prisoner was "snitching" on another.

When Olson returned to the cell block, he observed plaintiff, Thompson and Pataska, but he did not see "any scuffs, marks or other signs of an altercation." When Olson spoke to Pataska, Pataska did not indicate that he or anyone else had been in a fight. Neither Olson nor Schmitz asked plaintiff for more information about his note.

On May 23, plaintiff, Thompson and two other prisoners were playing cards in the day room. After plaintiff and his partner won several games in a row, Thompson and

4

plaintiff's partner began arguing. When plaintiff said he did not want to play anymore, Thompson told him, "You can't quit because I need to win my stuff back." When Thompson said "he was going to take all [plaintiff's] stuff," plaintiff said, "you ain't going to take nothing." Thompson continued yelling and saying that he was going to "kick [plaintiff's] ass."

Anticipating a fight, plaintiff walked over to his cell to put his shoes on. (Plaintiff "wasn't going to sit there and let [Thompson] jump [him] with sandals on and socks. [Plaintiff] went to go put on [his] shoes first.") After both plaintiff and Thompson put on their shoes, Thompson "came right straight at" plaintiff and punched him in the face. Plaintiff and Thompson wrestled "for a little bit" until plaintiff got away from him and "pushed the button by the phone." After that the fighting stopped. The struggle lasted about 20 seconds. Less than one minute elapsed between the time both prisoners left the table to put on their shoes and the time Thompson hit plaintiff. No jail staff witnessed the assault.

"Within a little bit," one of the jailers let plaintiff out of the day room. He was taken to the medical wing and staff called an ambulance for transport to the hospital. As a result of the assault, plaintiff suffered a significant amount of pain and his jaw had to be wired shut for several weeks.

When plaintiff returned from the hospital, he asked defendant Olson why he did not

5

"do something" in response to the note.  Olson said, "Well, I didn't think it would come to that, and I know you can take of yourself."

DISCUSSION

If a correctional officer knows of a substantial risk that a prisoner in his care will be seriously harmed, the Constitution requires the officer to take reasonable measures to protect that prisoner. The Supreme Court has described an officer's failure to act under such circumstances as "deliberate indifference" to the prisoner's safety.  Farmer v. Brennan, 511 U.S. 825 (1994). The question raised by defendants' motion for summary judgment is whether a reasonable jury could find that plaintiff satisfied this standard with respect to defendants when they failed to separate plaintiff from inmate Thompson before the assault on May 23, 2006.  Because plaintiff was a pretrial detainee, his claim arises under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment as in Farmer.  However, the standard is the same under either provision.  Washington v. LaPorte County Sheriff's Dept., 306 F.3d 515, 517 (7th Cir. 2002).

Many typical warning signs of a pending assault were not present before Thompson struck plaintiff:  Thompson and plaintiff were not enemies, e.g., Hayes v. New York City Dept. of Corrections, 84 F.3d 614 (2d Cir. 1996); Thompson was not identified as a gang member, e.g., Walsh v. Mellas, 837 F.2d 789 (7th Cir.1988); Thompson did not have an

6

extensive history of violence (at least not more than plaintiff), e.g., Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005); and plaintiff was not a member of a vulnerable group. E.g., Case v. Ahitow, 301 F.3d 605 (7th Cir. 2002). Further, plaintiff does not argue that defendants erred in classifying him as a maximum security prisoner or that defendants may be held liable because they were not monitoring the day room when the assault occurred.

In his proposed findings of fact, plaintiff cites his own testimony for the propositions that other inmates had complained to "jail staff" about Thompson "causing problems" and that "jail staff" knew that Thompson "had a temper issue and would snap all the time." Plt.'s PFOF ¶¶ 5,7, dkt. #44. However, these attempts to show defendants' knowledge of Thompson's dangerousness fail to meet at least two requirements for admissibility under Fed. R. Civ. P. 56: plaintiff does not explain how he has personal knowledge of these facts, Fed. R. Civ. P. 56(e)(1), and his allegations that Thompson "caus[ed] problems" and "would snap all the time" are simply too vague to qualify as "specific facts." Fed. R. Civ. P. 56(e)(2). Further, he fails to identify *which* members of the jail staff had knowledge about Thompson. There is no "collective knowledge doctrine" under § 1983 as there is in the context of a motion to suppress evidence. E.g., United States v. Whitaker, 546 F.3d 902, 905 (7th Cir. 2008). This means that plaintiff must prove that defendants Olson and Schmitz in particular knew about a substantial risk of harm, Luck v. Rovenstine, 168 F.3d 323, 327 (7th Cir. 1999); he may not allege facts about "jail staff" generally.

7

Plaintiff relies primarily on an inmate request form that he gave defendant Olson five days before the assault occurred. It said: "You need to check the cameras [be]cause the black retarded dude Koko hit Ron Ferri and Koko has started crap with me a few times. He hits me and I won't let him get away with it."

A key phrase in this note that both sides mostly ignore is "[h]e hits me." If plaintiff meant that Thompson had *already* hit him and plaintiff was afraid that he would do it again, this might be a strong indicator that plaintiff needed protection. E.g., Peate v. McCann, 294 F.3d 879 (7th Cir. 2002). However, it appears that the parties do not discuss the phrase because it is undisputed that plaintiff meant to say, "*If* he hits me, I won't let him get away with it" and that defendants read his note that way. In his deposition, plaintiff answered "no" to the question, "Have you ever had a prior fight with Lencardo Thompson?" Dkt. #38-2, at 132. He also testified that when he wrote that Thompson "started crap with me a few times," he was referring to Thompson "talking smack," *not* to an assault. Id. at 144-54. In his affidavit Olson avers that he read the note as saying that plaintiff was "a third party" rather than a "victim" to an assault. Dkt. #32 at 4, ¶9. In his brief, plaintiff's own interpretation is that he "anticipate[d] Thompson hitting him," dkt. #42, at 8, not that Thompson had already done so.

Plaintiff focuses on two other parts of the note in which he says that Thompson "hit" another prisoner and had "started crap" with plaintiff "a few times." Citing Klebanowski v.

8

Sheahan, 540 F.3d 633 (7th Cir. 2008), plaintiff argues that these are facts the court of appeals found to be crucial in that case and others: "the identities of those who threatened the inmate" and "what the threats were." Id. at 639 (citing Butera v. Cottey, 285 F.3d 601, 606 (7th Cir. 2002)). Plaintiff mischaracterizes the information in the note. He may have identified Thompson (at least by his nickname), but he did not identify a threat that Thompson had made to him.

Plaintiff's reference to Thompson's "hit[ting]" another inmate is unhelpful for multiple reasons. First, plaintiff left out many facts that would support a belief that a serious problem existed, such as where and when the incident took place, the nature of the attack against the other prisoner and the extent of his injury. The problems with plaintiff's account were only heightened by a lack of corroboration. Neither the alleged victim nor anyone else had complained about Thompson. Further, when defendant Olson spoke to the prisoner that he believed was the "Ron" in plaintiff's note, that prisoner did not say or do anything suggesting that he had been in a fight or had been harmed. Although it seems that defendants identified the "wrong" Ron, plaintiff has not shown that their belief was so unreasonable that it supports a finding of deliberate indifference.

Second, even if defendants believed that Thompson had "hit" another a prisoner, this would not necessarily mean that *plaintiff* was at a substantial risk of serious harm. Again, plaintiff points to no evidence showing that Thompson had a propensity for violence any

9

greater than his own.  I cannot conclude that a prisoner who hits one person is "almost certain," Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004), to hit anyone else in his path.

Plaintiff tries to paint himself as a more likely victim because he put in his note that Thompson was "starting crap" with him.  Again, this is an extremely vague comment. Plaintiff did not say that Thompson had hurt him or even that he was threatening to hurt him.  As noted above, he admits that he was referring to Thompson "talking smack."  If jail officials separated every inmate who "started crap" or "talked smack" with another inmate, there would be few inmates housed outside segregation.  Cf. Prater v. Dahm, 89 F.3d 538, 541-42 (8th Cir. 1996) ("[T]hreats between inmates are common, and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.")

Perhaps even more important is plaintiff's tone in the note, which was one of irritation rather than fear.  Nothing in the note suggests that plaintiff needs protection.  He did not ask to be placed in protective custody or even to be separated from Thompson.  His only request was for defendants to "check the cameras" for evidence of Thompson's incident with "Ron."  If anything, plaintiff seems defiant, calling Thompson "retarded" and issuing his own threat that he "won't let [Thompson] get away with it" if Thompson hits him. These are not the words of a man who is fearful of a serious assault.

Plaintiff's own actions suggest further that even *he* did not consider himself to be at

10

great risk from Thompson. If plaintiff was afraid of being assaulted by Thompson, one would think that plaintiff would have avoided Thompson whenever possible rather than continue to socialize with him. Plaintiff does not suggest in his brief or his proposed findings of fact that he was coerced or intimidated into playing cards with Thompson on the day of the assault. Defendants do not argue that plaintiff forfeited an Eighth Amendment claim by freely choosing to continue associating with Thompson, so I do not consider that question. E.g., Townsend v. Fuchs, 522 F.3d 765 (7th Cir. 2008) (questioning whether prison officials may be held liable under theory of deliberate indifference when prisoner "contributed" to his injury through his own choices). However, plaintiff's failure to take his own complaint seriously supports a view that the risk was not obvious to defendants either.

Plaintiff's response to the deficiencies of his note is twofold. First, he says he "felt it was unsafe for him to provide additional details about his concerns as [plaintiff] and Officer Olson were located in the dayroom with Mr. Thompson and the other inmates housed on [plaintiff's] block." Plt.'s PFOF ¶10, dkt. #44. This is a curious statement that plaintiff fails to explain. As noted above, plaintiff's professed fear is contradicted by his own statements and behavior. Further, plaintiff's proposed fact seems inconsistent with the position he takes in his brief, which is that defendant Olson should have allowed plaintiff to explain his problem verbally rather than make him write it down. One would think that a scared prisoner would be more reticent about providing an elaborate *verbal* grievance that could be

11

overheard by other prisoners than a detailed written note that could be handed off to Olson discreetly.

In any event, under <u>Farmer</u>, 511 U.S. 825, defendants may be held liable only for what they knew. Even if the reason for plaintiff's terseness was his fear, this does not require defendants to be mind readers. <u>Riccardo v. Rausch</u>, 375 F.3d 521, 526 (7th Cir. 2004) (concluding that prison guard was entitled to rely on plaintiff's statement that he did not "have a problem" with other prisoner who later assaulted him, even though plaintiff made this statement in front of other prisoner and even though plaintiff said earlier that he "feared for his life" if he were celled with any member of the other prisoner's gang). Perhaps the bravado plaintiff demonstrated in his note was simply a cover in the event that the note was intercepted. But if that is true, how were defendants supposed to read the tea leaves of plaintiff's note in order to realize that real trouble was brewing?

Plaintiff's answer to this question leads to his second argument, which is that defendants had a duty to investigate his note. In particular, plaintiff says, to the extent his note was lacking necessary detail, defendants should have followed up with him. Although plaintiff does not say so explicitly, his argument seems to be that defendants "turned a blind eye" to the danger that lurked. As both the Supreme Court and the court of appeals have acknowledged, a prison official may be charged with actual knowledge if he fails to confirm facts suspected to be true. <u>Farmer</u>, 511 U.S. at 843 (defendant may "not escape liability if

12

the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"); McGill v. Duckworth, 944 F.2d 344, 351 (7th Cir. 1991)("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent.") In other words, the Constitution does not reward those who play ostrich.  See also Goebert v. Lee County, 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness")

Plaintiff is not entirely accurate when he says that defendants failed to investigate his note.  After defendant Olson spoke with defendant Schmitz about the note, Olson returned to the cell block to observe plaintiff, Thompson and the prisoner Olson believed to be the "Ron" in plaintiff's note.  When Olson did not see any signs of a fight, he spoke to "Ron," who did not mention any problems he was having.

It is true that defendants did not talk to plaintiff further about his note, but I cannot conclude that the Constitution required them to do so.  Farmer does not impose an absolute obligation on correctional officers to investigate every complaint that comes before them in a particular manner.  Fisher v. Lovejoy, 414 F.3d 659, 662 (7th Cir. 2005) ("The test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.")  There is *no* duty to investigate unless the prisoner gives the officer a strong reason to suspect that he is in

13

danger. In this case, no reasonable jury could find that defendants were simply "playing ostrich" when they declined to investigate his note further because he gave them little reason to suspect a serious problem.

Finally, plaintiff argues that defendant Olson's awareness of the risk may be inferred from his statement to plaintiff, "I know you can take care of yourself," when plaintiff asked him why he did not "do something" in response to plaintiff's note. Plaintiff analogizes this response to a statement by an officer in Grieveson v. Anderson, 538 F.3d 764, 778 (7th Cir. 2008), who failed to make any attempt to stop a prisoner assault he witnessed, later stating that the prisoner needed to "learn how to fight harder or don't come to jail."

The view of the officer in Grieveson is unacceptable under Farmer. Although courts acknowledge often that "prisons are dangerous places," e.g., Riccardo, 375 F.3d at 525, it is also true that "prisoners are not required to live in a violent state of nature where brutal attacks are ignored." Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002). However, there is an important difference between a view of an officer that a prisoner *must* protect himself (the view of the officer in Grieveson) and one that a prisoner is *able* to protect himself (defendant Olson's view). The former suggests that the officer is aware of a risk of harm but does not care about it; the latter suggests that the officer does not believe that a risk of harm exists at all. Although such a belief may be mistaken or even irresponsible, that is not enough to establish liability under § 1983. Farmer, 511 U.S. at 837 (no liability if officer

14

"believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"). Further, in the same statement cited by plaintiff, Olson also said, "I didn't think it would come to that," which is consistent with a view that Olson did not believe an assault was likely.

Tellingly, plaintiff cites no cases with similar facts in this circuit or any other in which a court allowed a claim under § 1983 for an officer's failure to prevent an assault to proceed to trial. In fact, cases with stronger facts than plaintiff's have been rejected by the court of appeals. E.g., Grieveson, 538 F.3d 783 (rejecting all but one claim of prisoner who was assaulted *seven* times over 11-month period, including one instance in which he was assaulted by prisoner "who was angry over losing a card game"); Riccardo, 375 F.3d 521 (overturning jury verdict in favor of prisoner who was assaulted by gang member cellmate after telling prison officials that cellmate's gang had placed "a hit" on him); Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997) (rejecting claim of prisoner who was assaulted by gang members second time after officials refused to keep plaintiff in protective custody).

The case plaintiff cites, Case v. Ahitow, 301 F.3d 605 (7th Cir. 2002), involved allegations that officers purposely left the plaintiff alone with a prisoner who had a long history of prisoner-on-prisoner violence and had repeatedly threatened to beat and rape the plaintiff. The facts in this case come nowhere close to that. Although it is unfortunate that plaintiff suffered as he did, he cannot show that defendants violated his constitutional rights.

15

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants County of La Crosse, Steve Helgeson, Doris Daggett, Bill Olson, Lee Schmitz, Michael Horstman and Mike Weissenberger, dkt. #29, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 24th day of April, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge